[No. D007991. Fourth Dist., Div. One. Oct. 26, 1989.]

CITY OF SANTEE et al., Plaintiffs and Appellants, v.
COUNTY OF SAN DIEGO et al., Defendants and Respondents.

**COUNSEL**

McLean & McLean, Donald F. McLean, Jr., and Gloria S. McLean for Plaintiffs and Appellants.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, and Lewis P. Zollinger, Deputy County Counsel, for Defendants and Respondents.

**OPINION**

**HUFFMAN, J.**—The City of Santee and others (collectively Santee)[1] appeal from a judgment denying their petition for writ of mandate and injunctive relief. Santee seeks to compel the County of San Diego (County), by and through its board of supervisors (Board),[2] to set aside its certification of an environmental impact report (EIR) for the temporary expansion of the Las Colinas Detention Facility (Las Colinas) in the City of Santee for failing to prepare the EIR as required by the California Environmental Quality Act (CEQA).[3]

We find the EIR was inadequate because: (1) it fails to accurately describe the project and discuss the anticipated future uses of the "temporary"

---

[1] The appellants other than the City of Santee are the Santee Redevelopment Agency, the Santee School District, and individual taxpayers: Jack Doyle, Jim Bartell, Jack Dale, Roy A. Woodward and Michael Clark.

[2] Named as respondents, along with the County and the individual members of the Board (Brian Bilbray, Susan Golding, John MacDonald, Leon Williams and George Bailey), are county staff members Rich Robinson and James G. Tapp and the Lakeside Sanitation District.

[3] Public Resources Code section 21000 et seq. All future statutory references are to the Public Resources Code unless otherwise specified. When referring to statutory subparts we omit repetition of the word "subdivision."

project and the environmental effects of those uses, and (2) the discussion of the alternatives is inadequate under CEQA.

Because the EIR is invalid, a new EIR must be prepared, submitted for public review and comment, and certified in accord with CEQA procedures. We decline, however, to order the County's present activities at the temporary expansion site stayed pending certification of a new EIR.

I

FACTUAL AND PROCEDURAL BACKGROUND

On February 11, 1986, the Board declared that a state of emergency existed in the County because of the severe overcrowding in the adult detention system and directed county staff to immediately develop a plan to resolve the emergency situation. County thereafter acquired land in East Otay Mesa for purposes of constructing a permanent detention facility and determined to expand its present facilities in Vista and county honor camps. It also increased its operation of alternatives to incarceration to help reduce the number of inmates housed in county detention facilities.

However, faced with the planned temporary closure of the existing Vista facility to facilitate its expansion and the required temporary relocation of its 500 inmates, on July 8, 1987, the Board moved to expand the facilities at Las Colinas. Santee appeared at the hearing and testified in opposition to the expansion. After some discussion, the motion for the expansion, over the objections of Santee, was amended to read as follows: "The [Board] approves the expansion of [Las Colinas] by 600 beds for male prisoners, subject to approval of the [EIR]; directs the Chief Administrative Officer [CAO] to immediately implement his plan for the expansion of Las Colinas; directs the expansion, to the extent possible, be accomplished within the existing compound; waives Board Policies A-81, Procurement of Contract Services, and A-87, Restrictions for Sole Source Procurement; and authorizes the Director of Purchasing and Contracting to negotiate and execute an amendment to a contract with WESTEC Services, Inc. for the purpose of completing an [EIR] for the expansion at Las Colinas not to exceed $25,000; and directs that adequate landscaping be provided to protect visibility of project from the people of Santee."

This motion was passed by a four-to-one vote of the Board.

A second motion was made to clarify the lifetime of the Las Colinas expansion. After further discussion, the Board unanimously passed the

following amendment to its earlier motion: "The [Board] declares their intent to close the Las Colinas temporary male facility and move prisoners upon completion and availability for occupancy of the addition to the Vista jail, a major pre-arraignment facility, and the first phase of East Mesa, instructing staff to design East Mesa for use as a more permanent honor camp; and clarifies intent is that the Santee male facility will be the first to be closed when other facilities have been built which meet the need for jail beds, thereby eliminating the need for the 600 beds at Las Colinas."

In light of these motions, on July 13, 1987, the County, as the lead agency, filed a "notice of early consultation" that an EIR was being prepared for the expansion of Las Colinas as required under section 15083 of the CEQA Guidelines.[4] The notice described the project as an expansion of the existing Las Colinas facility in the City of Santee to include: "The existing women's facility will be increased by adding three 40' × 70' dorms, a dining hall and a work furlough building. These improvements are intended to facilitate the existing overcrowded conditions and to bring the capacity of the women's facility to 550 inmates. [¶] The expansion of [Las] Colinas will also include the addition of facilities to house 600 men inmates. The northeastern portion of the existing facility is currently unused. This unused land, plus a 3.8 acre parcel adjacent to, and north of the northern boundary, will be modified to accommodate 600 men in 10 dorms. This expansion will include 3 exercise yards, an administrative building, visitors center and parking, dining facilities, medical building, guard stations and fencing."

In response to the notice of early consultation, Santee filed written objections to the expansion and also filed suit to enjoin the County from employing consultants and preparing the necessary plans and specifications of the project until after an EIR had been completed and certified by the Board. (See City of San Diego v. Board of Supervisors (Super. Ct. San Diego County, 1987, No. 589497).) The trial court in that case denied issuance of a writ of mandate or injunctive relief on grounds CEQA required the County to design the proposed temporary expansion project concurrently with the preparation of an EIR so that all the information could be presented to the Board at the same time for final approval.

---

[4] The state CEQA guidelines, which implement the provisions of CEQA, are found in California Code of Regulations, title 14, section 15000 et seq. and will be referred to here as "Guidelines." While our Supreme Court has recently declined to resolve a lower court dispute over whether the Guidelines are regulatory mandates or only interpretive aids, it did note, "At a minimum, . . . courts should afford great weight to [them] except when a provision is clearly unauthorized or erroneous under CEQA. [Citation.]" (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].)

Following this decision, the Padre Dam Municipal Water District (Padre Dam), which serves the existing Las Colinas facility, denied the County's application for sewer service for the expansion project. Subsequently, Santee entered into an agreement with Padre Dam giving Santee's redevelopment agency control over the allocation of sewer capacity for projects located within its redevelopment area, which includes Santee's proposed town center and in turn encompasses Las Colinas, the proposed expansion and the surrounding 330 acres of adjoining open space owned by the County.

By November 25, 1987, it became apparent that Santee, through this agreement with Padre Dam, was going to thwart the County's attempt to obtain the sewer capacity it needed for the temporary jail expansion project. The County thus pursued other avenues to obtain sewer services, including a contract for the service with the Lakeside Sanitation District, and filed suit against Santee and Padre Dam challenging the legality of the agreement they entered into and seeking injunctive relief.[5]

Meanwhile, the County proceeded with preparation of the EIR and construction contract plans and specifications. In December 1987 the draft EIR (DEIR) was circulated for public review.

The DEIR defined the project similarly to the notice of early consultation and emphasized that the men's expansion would be "temporary." In discussing the mitigation measures, the DEIR noted that if the interim project were to remain open while adjacent properties in the Santee Town Center began to develop, "significant land use compatibility conflicts would occur with the newly developed properties."

The DEIR listed several "[m]itigation measures to ensure that the men's facility is utilized only as an interim facility to be removed prior to the development of the southeast quadrant of Santee Town Center . . . ." These measures included the adoption of a resolution in conjunction with certification of the EIR that the men's facility would be closed upon opening of "the permanent facility at East Mesa and the pre-trial detention facility (PTDF) in downtown San Diego. If the Las Colinas men's facility is not closed once the PTDF and first phase of East Mesa open, indicating that a need for additional beds beyond the first phase of East Mesa still

---

[5] The lawsuit against Padre Dam and Santee was originally filed in San Diego Superior Court on January 22, 1988 (San Diego Super. Ct. Case No. 595013) and transferred to San Bernardino Superior Court for hearing. (San Bernardino Super. Ct. Case No. CI242505.) The San Bernardino Superior Court subsequently ordered Padre Dam to authorize sewer capacity for the temporary detention facility.

exists, or if the opening of East Mesa and the PTDF are delayed significantly beyond the expected construction schedule, an amendment to the Board resolution and additional environmental review addressing the impacts of continued operation of the interim facility at Las Colinas would be required. New findings or statements of overriding considerations would also be required at that time." It was also suggested that if the facility were not closed once the PTDF and the first phase of East Mesa opened, the interim facility could be moved to the graded area of East Mesa that will be used for phase 2 of that project.

In response to the DEIR, the county received 16 letters of public comment during the 30-day public review period. Thereafter, the County responded to the comments, prepared the EIR in final form, and scheduled consideration of the final EIR before the County's planning and environmental review board (PERB).

On February 4, 1988, PERB conducted a public hearing on the final EIR for the proposed expansion of Las Colinas. After hearing comments both pro and con from numerous persons and agencies, PERB voted to recommend to the Board that the final EIR has been completed in compliance with CEQA and should be certified on condition that the project description be changed to reflect a seven-year limit with analysis to justify that particular time frame, that public service to the project should be found adequate but unresolved due to the lack of an identification of a sewering agency, and the addition of a public safety section discussing issues raised having to do with public contact with visitors and inmates and the mitigation of that impact be included.

On February 16, 1988, the Board was presented with the final EIR for consideration. After hearing testimony from both sides on the matter of the Las Colinas expansion and being apprised of the PERB recommendation, members of the Board expressed concern that the project was not given a termination date or that no assurances were given to Santee that the project would indeed be temporary. After further discussion, the Board adopted Resolution No. 66, which added certain changes or alterations to avoid or substantially lessen the significant environmental effects identified in the EIR.

These measures included Santee's recommendations the sheriff's patrol in the vicinity of the elementary school and Las Colinas be increased, the release of female prisoners be timed to occur during nonschool hours, and the bus stop which was presently in front of the school be relocated. The

resolution also insured that no male inmates shall be released in Santee, that visiting hours would be only during the evenings and weekends, and that a liaison would be established to monitor impacts of the facility on the schools and public safety in Santee.

While the Board identified the land use impact in the resolution as significant and not mitigable, it made the following statement of overriding considerations which it felt justified approval of the project over any other project alternatives: "Overcrowding in the San Diego County Adult Detention System has reached crises [*sic*] proportions. In fiscal year 1986-87 the adult detention facilities had a rated bed capacity of 2,315 inmates, but actually held on daily average 3,814 inmates. In August 1987, Camp San Jose was closed reducing the rated bed capacity to 2,249. On January 26, 1988 there were 4,387 inmates in the County's adult detention facilities. This number of inmates exceeds by 195 per cent the rated bed capacity of these facilities. [¶] The Vista Detention Facility is scheduled to close in May 1988 for 12 months of remodeling to add an additional 296 beds. The 500 Vista inmates must be temporarily relocated until the Vista expansion project is completed. Additionally, as a result of a lawsuit, a cap has been placed on the number of inmates that may be held at the Central Detention Facility in San Diego, and another lawsuit threatens to place an inmate population cap on each of the other County detention facilities. [¶] Because of the lack of jail space, the County Sheriff has had to book and immediately release an average of 2,080 persons per month charged with misdemeanor violations, and the City of San Diego Police Department has had to book and immediately release an average of 250 misdemeanor violators per month. If adequate jail facilities were available, these people would be detained from 3 hours to several days depending on a number of factors. [¶] The lack of adequate detention facilities is detrimental to residents and visitors throughout San Diego County. The solution to this problem is to build large, permanent detention facilities, such as the County's East Mesa project and the Vista jail expansion. However, the problem is so severe that immediate, interim relief is absolutely necessary until the large, permanent facilities are built. In light of this critical need for immediate, temporary relief, the County selected Las Colinas for the interim project because expanding an existing detention facility can be done faster and cheaper than constructing an entirely new facility. Las Colinas has the following advantages: [¶] County owns the site. No delays or costs for site acquisition. [¶] Existing infrastructure, such as sewer and water, can serve the additional inmates. No delays or costs for installing new infrastructure. [¶] Some of the exisiting [sic] facility's administrative and support services can serve the additional inmates. Cost savings by using some of the existing administrative and support services for additional inmates. [¶] Site is buffered from

residential areas by open space, Edgemoor Hospital and mature vegetation. [¶] Some of the alternative sites had one or more of these advantages, but none had all of these advantages. The benefits to the entire County of providing immediate, partial relief for the critical jail overcrowding problem outweigh whatever negative land use impacts this project may cause."

As so resolved, the Board certified the EIR and approved by a four-to-one vote the Las Colinas expansion to accommodate an additional 150 female inmates and 600 male inmates, directed the CAO to proceed immediately with the project and provided that the temporary expansion project "shall be removed in a maximum of 7 years from the date the project begins operating."

On March 17, 1988, Santee filed its petition for writ of mandate and complaint for injunctive relief alleging numerous defects in the EIR and inadequacies in the EIR process. Based on its petition and complaint, Santee also sought ex parte an application for a temporary restraining order regarding the awarding of public works contracts entered based upon the Board's resolution. This application was denied and the hearing on the writ of mandate and injunctive relief was set for April 15, 1988.

At that time, the trial court denied the relief sought and granted Santee's request for a written statement of decision. On April 28, 1988, the court filed that statement, finding the Board had not abused its discretion, there was no showing the Board had proceeded in a manner contrary to law, and the Board's decision was supported by substantial evidence. The court additionally found Santee was not entitled to injunctive relief. Santee immediately appealed from the denial.

On May 5, 1988, Santee filed a petition for supersedeas with this court, requesting an immediate stay to stop the County from proceeding with the temporary expansion of Las Colinas pending the outcome of the appeal. We denied the petition May 11, 1988. The California Supreme Court subsequently denied Santee's request of May 23, 1988, for an immediate stay of the project pending appeal made to that court.

Then, on May 27, 1988, the trial court filed an amended statement of decision to add "male" as an adjective to "prisoners" so as to identify "male prisoners" for nonrelease in Santee and entered judgment in the matter. Thereafter, Santee again timely appealed, filing an amended notice of appeal from the denial and judgment.

## II

## DISCUSSION

On appeal, Santee raises every conceivable attack upon the EIR and its process: the EIR's analysis of future activity and effects is inadequate under CEQA; the County's action in approving the expansion of Las Colinas must be set aside because a superior feasible alternative exists; the EIR is misleading to the public; the EIR does not adequately address project alternatives; the EIR does not address specific environmental impacts; the EIR does not discuss feasible mitigation measures; the county did not proceed in the manner required by law, i.e., it did not incorporate some of the mitigation measures identified in the EIR into the resolution before approval and its finding of infeasibility of alternatives is legally insufficient; the resolution certifying the EIR does not contain findings adequate to support the conclusions; and the findings contained in the resolution certifying the EIR are not supported by the evidence. The County counters that Santee's arguments its actions were inadequate, unlawful and misleading are without merit.

Because we conclude the EIR is fatally flawed due to its inaccurate project description and the omission of an adequate analysis of future uses of the "temporary project," which in turn taint the adequacy of the discussion of project alternatives under CEQA, we do not address each individual contention. Rather, we review the sufficiency of the final EIR certified by the Board and its resolution in light of the record, the appropriate standard and the principles established by CEQA.

### A

### *Standard of Review*

Generally, consideration of an EIR's adequacy is a judicial function. (*Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 704 [104 Cal.Rptr. 197].) Section 21168.5 provides that a court's inquiry into the appropriateness of an agency's action under CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." Courts, however, do not pass upon the correctness of an EIR's environmental conclusions, but only upon its sufficiency as an informative document. (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].)

As recently noted by our Supreme Court in *Laurel Heights,* "[t]his standard of review is consistent with the requirement that the agency's approval of an EIR 'shall be supported by substantial evidence in the record.' (Guidelines, § 15091, subd. (b).) In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.' [Citation.] The Guidelines define 'substantial evidence' as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' (Guidelines, § 15384, subd.(a).)" (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 392-393.) In reviewing the matter under this standard, we may not substitute our judgment for that of the local entity. (*El Dorado Union High School Dist.* v. *City of Placerville* (1983) 144 Cal.App.3d 123, 130 [192 Cal.Rptr. 480].)

"Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]" (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 393.)

## B

### Statutory Framework

The major premise of CEQA is the legislative intent the act "be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].) Section 21000(g) emphasizes that all governmental agencies must regulate their activities "so that major consideration is given to preventing environmental damage . . . ."

With certain exceptions,[6] CEQA requires a public agency to prepare an EIR whenever a proposed project may have significant effects on the

---

[6] The County states in its opening brief, and Santee acknowledges the County's position, that it could have sought a legislative exemption from the CEQA provisions under section 21080 and proceeded with the expansion without preparing an EIR. Under section 21080(b)(4), the County could have sought an exemption for taking "[s]pecific actions necessary to prevent or mitigate an emergency." However, it chose to prepare an EIR rather than show how the expansion as defined in the project description was exempt from the CEQA provisions. We, therefore, hold it to the CEQA standards.

environment. (§§ 21100 [state agencies], 21151 [local agencies]; Guidelines, § 15002(f)(1).) The EIR is an informational document with the stated purpose of providing public agencies and the public with "detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061; Guidelines, § 15003(b)-(e).) The agency must consider the EIR before approving or disapproving a project.

The normal procedure under CEQA is that the lead agency, the public agency having principal responsibility for carrying out or approving a project which may have significant effects upon the environment, notifies the public and interested parties that a draft EIR is being prepared (§§ 21092, 21092.1), and then evaluates the draft EIR in light of comments received. (Guidelines, §§ 15087, 15088.) A final EIR is then prepared incorporating comments on the draft EIR and the agency's written responses to those comments. (Guidelines, §§ 15090, 15132(b)-(d).) The final EIR consists of the draft EIR, the comments received on the draft, and the agency's responses to "significant environmental points raised in the review and consultation process." (Guidelines, § 15132.)

The lead agency must then certify the final EIR has been completed in compliance with CEQA and that it considered the information contained in the final EIR before approving the project. (Guidelines, § 15090.) Before approval, the agency must also find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that there are overriding considerations that unmitigated effects are outweighed by the project's benefits. (§§ 21002, 21002.1, 21081; Guidelines, §§ 15091-15093.) It must also make findings for each significant effect when approving a project which has one or more significant environmental effects. (Guidelines, § 15091.)

The EIR is "the heart of CEQA." (Guidelines, § 15003(a); *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) As such, it is the primary means of achieving the legislative declaration that the policy of this state is to "take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state." (§ 21001(a).) It is also an "environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." (*County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d 795, 810.)

Moreover, the Legislature has expressed the policy that an agency faced with a project with significant environmental effects has a duty under CEQA to avoid or minimize environmental damages whenever feasible before approving the project. (§§ 21002, 21002.1(b); Guidelines, § 15021.) CEQA defines "feasible" as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.)

The agency, however, retains discretion to approve a project despite its significant effects if specific economic, social or other conditions make alternatives or mitigation measures infeasible, provided the project is otherwise permissible under applicable law and regulations. (§ 21002.1(c).) Under these circumstances, the approving agency must balance the benefits of a proposed project against its adverse environmental effects; if the benefits outweigh those effects, they may be considered "acceptable." (Guidelines, § 15093(a).) As noted earlier, these overriding considerations must be set forth in findings to show "some evidence that the alternatives or mitigation measures in the EIR actually were considered by the decision making agency and . . . that there be a disclosure of 'the analytic route the . . . agency traveled from evidence to action.'" (*Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1034-1035 [185 Cal.Rptr. 41].)

In sum, the EIR is a document of accountability. "If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 392.)

With this framework and the factual background in mind, we turn to the general CEQA issues presented.

C

*The Temporary Project*

The final EIR before us defined the project as "the construction and operation of an interim men's detention facility and the expansion of the women's facility" at Las Colinas. It explained the interim facility would serve emergency needs of the County until new detention facilities relieved

the current problem of jail overcrowding. No specific time limit, however, was specified for this "interim" period.

No limitation on the lifetime of the project had been given in the early consultation notice of the proposed project, nor had one been described in the DEIR. The traffic analysis attached to the final EIR was based on measuring the interim or temporary project at three years and the comments of persons responding to the project reflect confusion as to the length of the proposed temporary project. It was not until the PERB hearing that the County in response to comments to the DEIR and concerns of PERB stated a defined time limit of seven years for the temporary project. Even with this seven-year recommendation, the Board at its hearing noted its original intent to only close the male expansion facility at such time that the additional Vista facility, the permanent East Mesa facility, and a PTDF downtown were completed and available for occupancy.

Moreover, the EIR does not discuss the additional environmental effects, if any, that will result from the existence of the temporary male detention facility at Las Colinas after seven years. The County merely offers the commitment that resolution No. 66 states the temporary facilities will be removed after seven years and that it was always the intent of the County the project be temporary; therefore, there was no need to address any future long-term environmental effects. ■ Based on CEQA and the holding of the Supreme Court in *Laurel Heights* concerning when an EIR must include an analysis of the environmental effects of future expansion or other action, we conclude the EIR was inadequate and the Board abused its discretion in certifying it as complying with CEQA.

"CEQA requires that an agency determine whether a project may have a significant environmental impact, and thus whether an EIR is required, *before* it approves that project." (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 79 [118 Cal.Rptr. 34, 529 P.2d 66], original italics.) The Guidelines explicitly provide that "Before granting any approval of a project subject to CEQA, every lead agency . . . shall consider a final EIR . . . ." (Guidelines, § 15004(a).) One of the major purposes of an EIR is to provide the decisionmaking agency with information to use in deciding whether to approve a proposed project, and not to inform them of the environmental effects of projects after the fact. "If post-approval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support action already taken." (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 394, original italics.)

Of particular importance here, CEQA mandates " . . . that environmental considerations do not become submerged by chopping a large project into many little ones—each with a . . . potential impact on the environment—which cumulatively may have disastrous consequences." (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 [118 Cal.Rptr. 249, 529 P.2d 1017].) CEQA attempts to avoid this result by defining the term "project" broadly. (Guidelines, § 15002(d).) " 'Project' means the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately, . . . ." (Guidelines, § 15378(a).) "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval. [¶] . . . Where the lead agency could describe the project as either the adoption of a particular regulation . . . or as a development proposal which will be subject to several governmental approvals . . . the lead agency shall describe the project as the development proposal for the purpose of environmental analysis." (Guidelines, § 15378(c)-(d).) There exists a real danger in the filing of separate environmental documents for the same project because consideration of the cumulative impact on the environment may never occur. (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 166 [217 Cal.Rptr. 893].)

Further, Guidelines section 15151 outlines the standard for an adequate EIR. Such provides "[a]n EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts. The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." Thus "reasonably anticipated future projects" should be considered in an EIR and discussed in a cumulative analysis. (See *Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 394 and *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d 151, 168.)

As noted in *Citizens Assn. for Sensible Development of Bishop Area,* "[r]elated projects currently under environmental review unequivocally qualify as probable future projects to be considered in a cumulative analysis. [Citation.] In addition, even projects anticipated beyond the near future should be analyzed for their cumulative effect. [Citation.]" (*Citizens Assn.*

*for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d 151, 168.)

In *Laurel Heights* the Supreme Court discussed the issue of what circumstances require consideration in an EIR of future action related to the proposed project. While recognizing that " 'where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences. . . .' " (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 395), it held future effects must be included if: "(1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Id.* at p. 396.)

In *Laurel Heights,* the Supreme Court applied this standard to find an analysis of future expansion was required under the facts of that case. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 396.) There, the draft EIR acknowledged that the University of California in San Francisco (UCSF) in relocating the biomedical research facilities of its school of pharmacy would someday occupy more of the Laurel Heights building moved into than that portion identified in the EIR. Since the remainder of the Laurel Heights building would at some future time be occupied by UCSF, the future expansion was a reasonably foreseeable future use, even if the precise use of the remainder of the building was then unknown; the future use needed to be discussed in the EIR " 'in at least general terms.' " (*Id.* at p. 398.)

By way of footnote, the court noted that a project of the magnitude of UCSF relocating to Laurel Heights appeared to be provided for in section 15168(a) of the Guidelines. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 399, fn. 8.) That section explains "that an agency can use a 'program EIR,' for 'a series of actions that can be characterized as one large project and are related either: (1) Geographically, (2) As logical parts in the chain of contemplated actions, . . . or (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways.' Section 15385 of the Guidelines provides for 'tiering' of EIRs, which is 'the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs . . . .' " (*Ibid.*)[7]

---

[7] We do not intend to suggest that a "Program EIR" is mandated in this case. We merely recognize applicable regulations and statutes provide for such an approach. Because we do not base our holding on the lack of a "Program EIR," but rather on the fact the existing EIR does not contain "an accurate, stable and finite project description" (*County of Inyo* v. *City of*

 Just as the Laurel Heights relocation facility appeared to be an excellent candidate for one of that type of EIR's, so too does the "temporary" expansion of the Las Colinas detention facility to house men. Not only does a reading of the record support a conclusion that some future action on the temporary project was contemplated, it also reflects the EIR here could be considered one small part of the larger project to ease jail crowding in the entire county.

As to future uses, the Board originally intended to remove the facilities to East Mesa either after the first phase of that project was completed or to relocate it there after it was completed in full. Additionally, the EIR cast some doubts on the removal of the project in seven years. The County's responses to comments concerning the "short term" proposal evidenced the probable need for jail facilities was projected to last longer than the seven-year lid placed on the project. Thus it is reasonably foreseeable that the project will continue for a longer term than seven years, and it is likewise reasonably foreseeable that the temporary male detention facility will be moved to East Mesa either before the end of seven years or at that time. These future uses should have been included in the EIR and their cumulative effects discussed.

Furthermore, at the time the Board declared the emergency in the County of San Diego concerning jail overcrowding, it asked its staff to study and prepare reports on all possibilities of dealing with the problem, not just the temporary relocation of 500 inmates from Vista. Thus a reasonable inference from that meeting of the Board is that a larger project was contemplated and the County is chopping it up into smaller projects rather than dealing with it as a total "program."

Keeping in mind that only through an accurate view of the project may the public and interested parties and public agencies balance the proposed project's benefits against its environmental cost, consider appropriate mitigation measures, assess the advantages of terminating the proposal and properly weigh other alternatives, we conclude that the project here did not contain "an accurate, stable and finite project description" which is the "*sine qua non* of an informative and legally sufficient EIR." (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d 185, 192-193.) The belated time frame of seven years added as a "finite" description of the project in the PERB recommendation and adopted by the Board in its resolution certifying the EIR was too little too late to adequately apprise all interested parties

---

*Los Angeles, supra,* 71 Cal.App.3d 185, 192-193), supplemental briefing is not required on the issue of whether such an EIR is mandated. (Gov. Code, § 68081.)

of the true scope of the project for intelligent weighing of the environmental consequences of the project.

We, therefore, hold that the EIR was inadequate. Like the Supreme Court in *Laurel Heights,* we do not prescribe the exact information or format the County must include in its EIR, but we expect it will attempt in good faith to fulfill its obligation under CEQA to provide sufficient meaningful information regarding the future of the temporary expansion project.

### D

*Feasible Alternatives and Mitigation Measures*

As noted earlier, CEQA and the Guidelines require that an EIR describe all reasonable alternatives to the project and any feasible mitigation measures. (See *Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 400-404.) While our review of the record does support that the alternatives and mitigation measures discussed for the assumed "temporary" project comport with the spirit of CEQA, because the EIR does not discuss the future uses as a project alternative or as mitigation measures except by making the general statement that the male facility would not last longer than seven years, the analysis of the project alternatives and mitigation measures is incomplete and, therefore, inadequate.

Because a new EIR is required, we commend to the County the review of the level of analysis of alternatives set out in *Laurel Heights* for its guidance. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 406-407.) We do not, however, discuss the other deficiencies raised by Santee concerning the EIR, concerning the process used by the County in certifying the EIR, or concerning the findings of the Board in its resolution. We trust that the County and the Board will faithfully fulfill their duties under CEQA on remand.

### E

*Continuation of the Temporary Project*

■ Our conclusion the EIR is inadequate under CEQA raises the issue of whether the County should be allowed to continue its present use of the temporary male detention facility at Las Colinas. We determine that such use may continue.

Section 21168.9, as construed by the Supreme Court in *Laurel Heights,* merely grants a reviewing court the authority to stay all activity or use of a project until an agency certifies a proper EIR; it does not require it to do so. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 423.) The court in *Laurel Heights* relied upon traditional equitable principles in deciding that injunctive relief there was not appropriate. (*Id.* at pp. 423-425.) Applying those principles to this case, we conclude injunctive relief is also not appropriate here.

Recognizing the emergency situation concerning countywide jail over-crowding and the good faith attempt of the county to comply with court limits on that overcrowding and the closing of the Vista detention facility, and in light of the ongoing permanent jail expansion projects, we believe CEQA will not be thwarted by allowing the existing temporary detention facility to remain at Las Colinas pending the new EIR process. We believe the County has the good faith and ability to prepare an EIR that complies with CEQA and that they will proceed apace to do so. We also reasonably assume Santee and the trial court will closely monitor the County's progress in complying with our decision. The trial court can reconsider the question of whether equitable relief terminating the expansion at Las Colinas is appropriate if there is evidence that the County cannot or will not prepare and certify a legally adequate EIR or is dragging its feet in doing so.

Because the temporary project has not gone past its prescribed limit of seven years, there is no evidence the environment is being adversely affected beyond the scope of the present EIR. As the defects in the EIR relate to future activities that the EIR failed to address, as it relates to the description of the project and the feasible alternatives and mitigating measures, the general public might be unduly prejudiced if we were to enjoin the use of the expanded Las Colinas facility. Thus we hold the County may continue use of that facility until a new EIR is certified and the project reapproved by the Board.

The County is reminded, however, that like the Supreme Court in *Laurel Heights,* this court will not countenance any attempt to reject an alternative on the ground that the Las Colinas site has already been completed and is already in use. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 425.) The Board must begin anew the analytical process required under CEQA and must not attempt to give post hoc rationalizations for actions already taken in violation of CEQA, even if done in good faith.

## III

### DISPOSITION

The judgment is reversed with directions to the trial court to issue a peremptory writ of mandate directing the County to set aside its resolution certifying the EIR as adequate under CEQA.

Pending certification of a proper EIR and reapproval of the project, the trial court is directed to allow the County to continue use of the Las Colinas expansion detention facility and to retain jurisdiction over this action and to specify promptly, after notice and hearing, a date by which the County must certify a new EIR in accordance with CEQA standards and procedures, including provisions for public comment, and to make any findings that may be required by CEQA.

Each party will bear its own costs.

Work, Acting P. J., and Todd, J., concurred.

A petition for a rehearing was denied November 21, 1989, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied January 17, 1990.