[No. F030405. Fifth Dist. Feb. 19, 1999.]

DRY CREEK CITIZENS COALITION et al., Plaintiffs and Appellants, v. COUNTY OF TULARE et al., Defendants and Respondents; ARTESIA READY MIX CONCRETE, INC., Real Party in Interest and Respondent.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 1.(b), 2., 3., 4., and 5. of DISCUSSION.

COUNSEL

J. William Yeates for Plaintiffs and Appellants.

Gresham, Savage, Nolan & Tilden, Robin Cochran and Penelope Alexander-Kelley for Defendants and Respondents and for Real Party in Interest and Respondent.

OPINION

**THAXTER, J.**—In this appeal we are asked to determine the sufficiency of an environmental impact report (EIR) prepared by Tulare County (County) for the proposed expansion of a surface mining operation by Artesia Ready Mix Concrete, Inc. (Artesia). Appellants are four associations: the Dry Creek Citizens Coalition, the National and Tulare County Audubon Societies and the California Native Plant Society. The novel issue on appeal is whether the water diversion elements of the project are adequately described under title 14, section 15124, subdivision (c) of the California Code of Regulations.[1]

In addition, appellants challenge the project description with regard to access road improvements, three mitigation measures and the cumulative impacts analysis as to biological resources. They also contend County violated California's Surface Mining and Reclamation Act of 1975 (SMARA)[2] by failing to submit the reclamation plan and financial assurances to the California Department of Conservation for review prior to approving the plan and surface mining permit. We conclude the judgment of the trial court should be affirmed. The EIR complies with the California Environmental Quality Act (CEQA),[3] and any violation of SMARA was not prejudicial.

FACTUAL AND PROCEDURAL BACKGROUND

Artesia's sand and gravel mining operation is located in the lower foothills of the Sierra Nevada on the eastern edge of the San Joaquin Valley in Tulare County. The site lies in the Dry Creek floodplain. Dry Creek is an intermittent stream that traverses the center of the site, flowing from north to south. Dry Creek's average annual runoff is 16,400 acre-feet, with about 95 percent

---

[1] All further citations to the California Code of Regulations, title 14, section 15000 et seq. will be referred to as Guidelines.

[2] Public Resources Code sections 2710-2796. All statutory references are to the Public Resources Code unless otherwise indicated.

[3] Section 21000 et seq.

of this runoff occurring between December and May. The flow is less than five cubic feet per second (cfs) about two-thirds of the time, and the stream is dry about 40 percent of the time.

Artesia has been mining the site since 1992 under a permit which will expire in 2000. The current project site encompasses 152 acres, of which 35 acres were approved for mining. The present permit does not allow excavation within the stream channel or below the elevation of the streambed in areas adjacent to the channel.

*Project Description*

In 1994, Artesia applied to County to amend its existing surface mining permit and reclamation plan and for a special use permit to expand its area of sand and gravel excavation in and adjacent to Dry Creek. The amendment also would extend the life of the current permit to the year 2026.

Under the new permit, Artesia would expand its mining and processing area from its current 33.5 acres to 162 acres. The amendment allows excavation to greater depths and within the Dry Creek channel and floodplain. Excavations will extend 20 to 70 feet below the existing surface, eventually forming a pit along Dry Creek. The pit will be reclaimed as a lake to be maintained by surface and subsurface flows associated with Dry Creek. When mining activities are complete, the lake will cover about 45 acres and be surrounded by sycamore woodland vegetation. The lake will be situated 150 feet south of the site's northern boundary and about 150 feet north of the site's southern boundary.

The project includes several features to ensure the excavation will not affect water flow on adjacent lands. Because of these features, most of the stream flows each year will be diverted over the project site. However, in time the lake will fill. Thereafter, lake water levels will fluctuate depending on yearly rainfall.

*Environmental Review*

In October 1994, County, as lead agency, issued its notice of intent to prepare a draft EIR for the project and received numerous letters in response. In December 1995, County circulated a draft EIR prepared for County by Woodward-Clyde Consultants. The EIR stated the proposed project would result in a number of significant, but mitigatable impacts. Among the comments County received, the Kaweah and St. Johns Rivers Association (Association), a private organization with jurisdiction over the allocated

surface water rights for those rivers, noted the project could potentially interfere with downstream water flow and affect those rights. As a result, Artesia entered into a memorandum of understanding (MOU) with the Association whereby Artesia agreed to, among other things, construct a bypass channel and diversion structures which will divert water flows of 300 cubic feet per second or less around the mine pit to mitigate the downstream water loss.

Inclusion of the water diversion structures in the project necessitated a revision of the draft EIR. The revised project description included the bypass channel and the inlet and outlet diversion structures. The revised draft EIR identified and analyzed a number of potential significant project impacts, but concluded all could be mitigated by identified measures to a level less than significant. Artesia accepted the mitigation measures, which were made conditions of the project's approval. In August 1996, County circulated the revised draft EIR among responsible governmental agencies and interested parties for review and received a number of comments. The final EIR (FEIR) incorporates these comments and County's responses to them.

In November 1996, after public hearings, the planning commission certi-fied that the FEIR was prepared in compliance with CEQA and approved the surface mining permit for the expansion project, subject to 85 conditions. The planning commission found that changes or alterations which had been incorporated into the project or made conditions of project approval miti-gated or avoided all the significant environmental impacts identified in the EIR. Appellants appealed that decision to the County Board of Supervisors (Board). After an extensive public hearing, Board found appellants' chal-lenges to the decision of the planning commission to be without merit. Based on the FEIR and the record before it, Board unanimously agreed the project as mitigated would have no significant effect on the environment and approved the project.

Appellants filed a petition for writ of mandate and complaint for injunc-tive and declaratory relief in the trial court challenging County's certifica-tion of the FEIR and approval of the project on the same grounds raised on appeal. The court denied the petition without explanation.

DISCUSSION

*Standard of Review for CEQA Issues*

In reviewing an agency's determination under CEQA, a court must determine whether the agency prejudicially abused its discretion.

(§ 21168.5.) Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence. The court does not pass on the correctness of an EIR's environmental conclusions, but determines whether the EIR is sufficient as an informational document. (§ 21168.5; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392, 407 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).) An adequate EIR must be "prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences." (Guidelines, § 15151.) It "must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights I, supra,* at p. 405.) The court must uphold an EIR if there is any substantial evidence in the record to support the agency's decision that the EIR is adequate and complies with CEQA. (47 Cal.3d at p. 392.)

CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive. (Guidelines, § 15151.) The absence of information in an EIR does not per se constitute a prejudicial abuse of discretion. (§ 21005.) A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process. (§ 21005; *Laurel Heights I, supra,* 47 Cal.3d at pp. 403-405.)

## 1. *Adequacy of the Project Description*

 The project description must contain sufficient specific information about the project to allow the public and reviewing agencies to evaluate and review its environmental impacts. A project description that omits integral components of the project may result in an EIR that fails to disclose the actual impacts of the project. (*Santiago County Water Dist.* v. *County of Orange* (1981) 118 Cal.App.3d 818, 829 [173 Cal.Rptr. 602].) Several cases illustrate inadequate project descriptions.

In *Santiago County Water Dist.* v. *County of Orange, supra,* 118 Cal.App.3d 818, an EIR for a sand and gravel mining operation was inadequate because the project description omitted mention of the construction of water delivery facilities that were an integral part of the project. Existing water delivery equipment could not supply the water needs of the project. The water district pointed out the lack of facilities during the EIR process,

but the county responded simply that the developer would furnish the district with " 'detailed plans of works.' " (*Id.* at p. 829.) The court concluded that omission of the necessary water facilities construction resulted in some important ramifications of the proposed project remaining hidden from view when the project was being analyzed and approved. (*Id.* at pp. 829-830.)

Similarly in *Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 414-415 [151 Cal.Rptr. 866], an EIR prepared for a test oil well project failed to consider the environmental impacts associated with an oil pipeline to service the facility if the well proved successful. Although admittedly contingent on certain occurrences, the pipeline was part of the overall plan for the project and could have been discussed in the EIR in "at least general terms."

In *San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus* (1994) 27 Cal.App.4th 713, 721-722 [32 Cal.Rptr.2d 704] (*San Joaquin Raptor*) this court held that a project description for a housing development that did not include the expansion of a public wastewater treatment plant was legally inadequate. Because the housing development could not proceed without the plant expansion, the expansion was an integral component of the project. (*Id.* at p. 734; accord, *Stanislaus Natural Heritage Project* v. *County of Stanislaus* (1996) 48 Cal.App.4th 182, 194-195 [55 Cal.Rptr.2d 625] (*Stanislaus Natural Heritage*).)

In this case, appellants contend the FEIR inadequately describes the stream diversion structures and the Dry Creek Drive improvement program. Neither contention has merit.

(a) *Bypass Channel and In-stream Structures*

Appellants contend the EIR provides an inadequate "conceptual" description of the bypass channel, cutoff walls, and in-stream diversion structures. The actual design of these structures is deferred until after project approval. As a result, the EIR fails to adequately consider the synergistic effects of these parts of the project. Appellants' challenge is different from that raised in the *Santiago County Water Dist.*, *Whitman*, *San Joaquin Raptor* and *Stanislaus Natural Heritage* cases. Those cases involved EIR's which omitted an integral component of a proposed project from the project description. In this case, the EIR includes the challenged structures in the project description; but appellants contend the descriptions are inadequate. They claim only precise engineering designs provide the necessary detail to analyze the environmental consequences of the entire project under CEQA.

The CEQA Guidelines provide: "The description of the project shall contain the following information but should not supply extensive detail

beyond that needed for evaluation and review of the environmental impact. [¶] . . . [¶] A *general description* of the project's technical, economic, and environmental characteristics, considering the principal engineering proposals if any and supporting public service facilities." (Guidelines, § 15124, subd. (c), italics added.) No reported cases have interpreted this requirement.

CEQA requires a "general description" of the project's technical characteristics. "General" means involving only the main features of something rather than details or particulars. (Webster's New Internat. Dict. (3d ed. 1986) p. 944.) The "general description" requirement for the technical attributes of a project is consistent with other CEQA mandates to make the EIR a user-friendly document. For example, Guidelines section 15140 states that EIR's must be written in plain language so that decisionmakers and the public can rapidly understand them. The general description requirement also fosters the principle that EIR's should be prepared early enough in the planning stages of a project to enable environmental concerns to influence the project's design. (Guidelines, § 15004; *Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 738 [270 Cal.Rptr. 650] (*Kings County Farm Bureau*).) ▆▆ A general description of a project element can be provided earlier in the process than a detailed engineering plan and is more amenable to modification to reflect environmental concerns. (Cf. *San Joaquin Raptor, supra,* 27 Cal.App.4th at p. 742; and see *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 199 [139 Cal.Rptr. 396] [CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; new and unforeseen insights may emerge during investigation, evoking revision of the original proposal].)

On the other hand, a curtailed or distorted description of the project may " 'stultify the objectives of the reporting process.' " (*Kings County Farm Bureau, supra,* 221 Cal.App.3d at p. 738.) The degree of specificity required depends on the type of project. There must be sufficient information to understand the environmental impacts of the proposed project. (Guidelines, § 15146, discussion.) The EIR must achieve a balance between technical accuracy and public understanding. (Guidelines, § 15147, discussion.)

*Descriptions of the Water Diversion Structures*

The EIR describes the bypass channel as an "earthen unlined channel which will have a 10-foot-wide bottom and 2:1 slopes and a depth of 10 feet." The channel is depicted in the contour map of the mining plan prepared by Lane Engineers at figure 4, in a schematic north-south cross-section illustration of the project at figure 5, and in two schematic east-west

cross-section illustrations of the project at figures 6a and 6b. The EIR states, "The channel will be designed by the applicant, and approved by the Association to divert the agreed-upon flows across the mine site, and to ensure no headcutting[4] or downstream erosion would occur. The by-pass channel must be maintained (i.e., periodic cleaning and repairs) after final reclamation of the mine site . . . ."

The purpose of the channel is "to convey flows of 300 cfs or less across the site without interruption," and to reduce the magnitude of downstream bank erosion by transporting stream sediment load across the mine site. The EIR notes that creation of the bypass channel may impact downstream water flow if the channel leaks. However, based on the hydrology study, the EIR concludes any bypass channel leakage will be similar to natural percolation from the stream channel.

The EIR describes the instream structures as follows:

"The inlet for Dry Creek will be a gentle sloped area with a rock layer to prevent erosion (Figure [7]). A 10-foot high diversion structure will be installed at the inlet to divert flows from [Dry] Creek that are 300 cfs or less. This structure would include a concrete spillway for flows that exceed 300 cfs, which would fill the lake. The elevation of the inlet area would be established at the current channel invert, at about 533 feet MSL [mean sea level].

"A buried groundwater cut-off wall would be installed concurrently with the inlet/diversion structure (Figure [7]). It would consist of a[n] 8 to 10-foot-high slurry of cement and sand design to be impervious for an indefinite amount of time, and thereby prevent dewatering of upstream alluvium when the pit is excavated. The cut-off wall would be about 750 feet wide (Figure 4).

"The outlet structure at the southern end of the pit will be located at the present location of Dry Creek. The outlet would be constructed by excavating material and backfilling it with overburden. Grouted rip-rap would be placed on the reclaimed area to prevent erosion (Figure [8]). The elevation of the outlet area would be established at the current channel invert elevation, at about 516 feet MSL.

"A buried groundwater cut-off wall would be installed concurrently with the outlet structure (Figure [8]). It would consist of a[n] 8 to 10-foot-high

---

4"Headcutting" is described in the EIR as the process by which the excavation "migrates" in the upstream direction through erosion resulting from the action of flowing water.

slurry of cement and sand design to be impervious for an indefinite amount of time, and thereby prevent dewatering of downstream alluvium when the pit is excavated. The cut-off wall would be about 2000 feet wide (Figure 4)."

Figures 7 and 8 are cross-sectional scaled design drawings of the inlet and outlet structures. Figure 4 is a drawing of the future mining and reclamation plan for the site including the diversion structures.

Under the portion of the project description addressing mine drainage and erosion, the EIR states that an inlet area with rock armoring will be constructed at the existing Dry Creek channel invert (lowest point) at the north end of the site to prevent upstream headcutting. A concrete cutoff wall will be constructed across the alluvial portions of the north side of the site to prevent dewatering of the adjacent alluvial areas into the mine pit. The cutoff wall will be installed from bedrock to within about five feet of the creek channel invert. The lake outlet at the south end of the site will be situated at the existing creek channel invert to maintain the existing stream gradient and elevation drop across the site to prevent downstream erosion.

Three of the commenting responsible agencies criticized or made recommendations regarding the descriptions. The California Department of Conservation (DOC) stated the bypass channel was not developed in sufficient detail and had several potentially critical problems. The unlined channel bed was subject to erosion, downcutting and piping failures. The channel appeared to abruptly transition from the natural channel. Abrupt transitions are prone to erosion and deposition and require maintenance to retain design parameters. In addition, the downstream grade control structure proposed was inadequate. It was not an engineered structure and reflected no particular hydraulic design criteria. The structure could fail because it was not keyed into a stable substrate.

The California Department of Fish and Game (CDFG) commented that the bypass channel should have the same width, depth, grade and side bank slopes as the original channel. It should be constructed out of sand and gravel alluvium, rather than fine earth, silt or clay, to avoid downstream siltation impacts. The proposed 10-foot width and 10-foot depth may accelerate flows over the current structure of the creek channel, further intensifying erosion potential. The CDFG recommended the channel have "meander room" to allow for future natural hydraulics.

The California Department of Transportation commented that the outlet structure shown in figure 8 had no cutoffs or toe downs and was unlikely to withstand significant discharges. The structure should be engineered to maintain its integrity during at least a 100-year discharge.

County's written response to the comments regarding the bypass channel included that the design in the EIR is conceptual. Further, as a condition of project approval, County will require the channel be designed by a registered engineer, and the County Public Works Department and Association will approve the final design. (Mitigation Measure SW-3.) County will conduct an engineering review of the channel design to ensure it meets appropriate engineering and design criteria. Potential hydraulic problems cited by the DOC and the CDFG will be addressed. The final design will include hydraulic calculations to demonstrate that bank erosion will not occur and a description of construction materials. The DOC will be able to review and comment on the design when the final reclamation plan is submitted to it. County noted the degree of meander in the conceptual plan is equal to, or greater than, the existing channel across the site. However, it will require Artesia to consider the feasibility of widening the channel to allow more low-flow meanders.

Regarding the outlet structure, County responded that that design, too, is conceptual. The proposed outlet elevation will be the same as the current stream invert elevation. There will be no elevation drop at the outlet that would cause increased velocities. The final design will address the need to key into stable bedrock. As a condition of approval, County will require that a registered engineer design the outlet and County Public Works Department as well as Association will approve the final design. (Mitigation Measure SW-3.) In addition, County will conduct an engineering review of the design to ensure it meets appropriate engineering and design criteria and will withstand a 100-year flood event.

*Appellants' Contentions*

Appellants contend the EIR's "conceptual" descriptions of the channel and in-stream structures fail to provide the "detailed information" which CEQA requires. Consequently, County's environmental review of the project failed to adequately consider the synergistic effect of these parts of the project. Their challenge has three aspects: (1) the conceptual descriptions are insufficient to analyze the environmental impacts, (2) the EIR simply assumes the structures will function as intended, and (3) the EIR defers approval of the final design of the structures until after project approval and limits that review to County, the DOC and the CDFG. Each contention is considered in turn.

(1) *Adequate detail for environmental analysis*

The adequacy of an EIR's project description is closely linked to the adequacy of the EIR's analysis of the project's environmental effects. If the

description is inadequate because it fails to discuss the complete project, the environmental analysis will probably reflect the same mistake. (*Laurel Heights I, supra,* 47 Cal.3d 376; *San Joaquin Raptor, supra,* 27 Cal.App.4th 713.) Appellants provide a number of examples, which they contend illustrate how the conceptual descriptions impeded environmental review.

First, they submit, the EIR fails to analyze how the grade control structure, the bypass channel and diversion structure will be designed, sited and maintained to prevent headcutting. Not so; the EIR states that an excavation 70 feet below the existing stream bed in the northern end of the project site will lead to significant upstream headcutting. To control headcutting, a grade control structure that also diverts the creek into the bypass channel is proposed. The statement in the EIR is based on a 1996 hydrology study by Bookman-Edmonston Engineering, Inc., regarding the proposed project's impacts on surface and groundwater. The study states that the presence of a mined pit in the streambed adds energy to the system by increasing the water surface slope just upstream of the pit. The steeper slope has greater sediment transport capability and therefore increases stream bed erosion and headcutting. The report continues, improvements at the upstream end of the site will include some form of cutoff and/or rock-stabilized slope to prevent headcutting. Although the planned grade control and the bypass channel headworks have not been designed, if they are constructed in a manner which maintains the existing cross-section or inlet condition, there should be no measurable change in flow velocities or depths upstream of the site.

The description of the inlet structure in the EIR incorporates the hydrology study recommendations to prevent headcutting. The description reflects that the inlet structure grade control will be built with a gentle slope, rock-stabilized, to prevent erosion and in a manner that will maintain the existing channel inlet elevation. The EIR sufficiently describes and analyzes how the grade control and diversion structures will prevent headcutting.

Second, appellants contend the EIR fails to analyze the possibility that stream sediment will deposit at the base of the diversion wall so that, after one flood event, the wall will no longer divert 300 cubic feet per second into the bypass channel. The EIR addresses this concern by noting that under the terms of the MOU, Artesia must maintain the bypass channel, which includes periodic clearing and repairs.

Third, appellants contend the EIR fails to respond to concerns raised by John C. Dofflemyer, the immediate downstream landowner and a member of appellant Dry Creek Citizens Coalition, about the inadequate design and

potential consequences of the water diversion structures. They assert, "[r]ather than adequately describe the structure or respond to the comments about the synergistic consequences of the by-pass channel and instream structures, the lead agency merely concluded that groundwater will 'continue to be recharged annually by stream flow, as it has in the past.'" The record belies this claim.

Mr. Dofflemyer feared that riparian plant consumption and leakage would diminish the creek flow available to his lands through the bypass channel. He stated that greater design detail would enable him to determine how the channel will affect his water supply. However, he conceded the EIR had identified a 2 percent reduction in average annual streamflow immediately downstream of the project site as a project impact but found it to be "insignificant" under CEQA. That conclusion was supported by the hydrology study which concluded that on-site channel losses would be comparable regardless of whether Dry Creek flowed over the project site in its current streambed or in the bypass channel. The gist of Mr. Dofflemyer's challenge was that the loss was not "insignificant" to him. Appellants do not point out how additional detail regarding the diversion structures would enhance environmental review in this regard. Mr. Dofflemyer's contrary opinion regarding the significance of this project impact does not render the project description inadequate.

Mr. Dofflemyer also was concerned that the cutoff wall below the project site would block groundwater flow to the downstream sycamore alluvial woodland, and the cutoff wall above the site would cause water to pool, which would negatively impact woodland north of the site as well. The record demonstrates his concerns were unfounded. First, the hydrology report indicated the alluvium at the mine site does not pass on significant amounts of groundwater. Under natural conditions, groundwater flow in the alluvium is only a minor component of groundwater recharge. Water levels in the alluvium are maintained and recharged by seepage from Dry Creek and rainfall. Second, the cutoff walls will not block all subsurface water flow. They are designed to control groundwater levels and allow groundwater to pass through or over at the appropriate elevation in comparison to current conditions.

(2) *Assumption that structures will function as intended*

Appellants contend the EIR simply assumes the diversion structures can be designed to accomplish their purposes and thus fails to meet CEQA's mandate to provide facts and analysis rather than bare conclusions and

opinions. (*Laurel Heights I, supra,* 47 Cal.3d at p. 404.) This contention fails in light of evidence to the contrary. The EIR analyzes the water diversion structures in relation to their function—to mitigate various surface and groundwater impacts resulting from the mining operations. The structures and the analysis are based on the hydrology study (facts) completed for the project. Moreover, according to J. Michael Lane of Lane Engineers, Inc., who provided the project drawings, design criteria for water conveyance structures, diversion structures, and erosion control devices are well established. Thus, County's implied finding that the structures will be designed to function as intended is based on fact and a reasonable analysis.

### (3) *Deferral of final designs*

Appellants next contend the EIR unlawfully defers approval of final designs for the diversion structures until after project approval and limits that review to County, the DOC and the CDFG. They submit such post-approval review fails to fully inform the public and the decision maker of the environmental consequences of the project and frustrates the policy that " ' "EIRs should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design." ' " (*Laurel Heights I, supra,* 47 Cal.3d at p. 395.) Appellants view this case as analogous to the situation in *Stanislaus Natural Heritage, supra,* 48 Cal.App.4th 182.

In *Stanislaus Natural Heritage,* the county approved an EIR for a project creating a 5,000-unit resort and residential community without an on-site water source. The county deferred any analysis of significant environmental effects of supplying that water with the understanding that those effects would be addressed in a later EIR to be prepared after the project was approved. The county then adopted a "mitigation measure" precluding any development requiring over 1,200 acre-feet per year of water unless the applicant could show that adequate water supplies were available. (48 Cal.App.4th at pp. 188-189, 194-195.) This court held that the county's approval of the project under those circumstances defeated a fundamental purpose of CEQA to inform the public and responsible officials of the environmental consequences of their decisions before they are made. (*Id.* at p. 195.) Further, the county could not mitigate a significant environmental impact by saying the project would not be built if the impact was not addressed. (*Id.* at p. 205.) Because the project contemplated supplying water to a large development, CEQA required the county to attempt in good faith to provide sufficient meaningful information regarding the types of activity and environmental effects reasonably foreseeable from supplying that water. (*Stanislaus Natural Heritage, supra,* at p. 206.)

Similarly in this case, appellants claim, County found the potentially significant adverse effects of the project on Dry Creek streamflow will be adequately mitigated by the construction of in-stream structures and five related conditions of project approval. In so finding, County assumed the structures could be designed, constructed, operated and maintained to meet their purpose. However, the actual design of the structures, like the determination of the actual water supply in *Stanislaus Natural Heritage*, was deferred until after project approval. Thus, the EIR failed to adequately analyze and inform the public of the environmental consequences of the entire project. We disagree with appellants' claims.

The "conceptual" description of the diversion structures for the mining project in this case is not comparable to the failure to identify a water source in *Stanislaus Natural Heritage*. Here, the technical and environmental characteristics of the structures are described and illustrated in general terms in compliance with Guidelines section 15124, subdivision (c). Further, there are well-established design criteria for each. In Mr. Lane's experience, final design, engineering and construction plans are always done after conditional project approval and are often driven by the conditions of approval. That is the situation in this case. Final design of the diversion structures must reflect five conditions of project approval: condition No. 22(3) (channel must divert agreed-upon flows across mine site and ensure no headcutting or downstream erosion), condition No. 59(d) (structures must withstand 100-year flood event), condition No. 60 (no alluvial mining unless conditions are met), condition No. 65 (Artesia must conduct annual survey to monitor channel changes and ensure no up- or downstream erosion occurs), and condition No. 67 (if survey indicates significant changes in streambed, in-stream mining must be discontinued until channel stabilization structures are installed).

In a related argument, appellants claim County's failure to select either a trapezoidal irrigation-type ditch as described in the EIR or the simulated natural meander-type bypass channel urged by the CDFG resulted in the EIR failing to analyze either design. The record is to the contrary. The bypass channel proposed and evaluated in the EIR is an "earthen unlined channel which will have a 10-foot-wide bottom and 2:1 slopes and a depth of 10 feet." The channel will leak but in an amount expected to be similar to natural percolation. In response to a CDFG request for a more natural channel, County will require Artesia to consider the feasibility of widening the channel to allow more meander. Implicit in County's directive to Artesia to consider widening the channel if feasible is the mandate that the widened channel will function as initially described and divert the agreed-upon amount of water downstream.

Appellants have not established that the general description of the diversion structures in the EIR coupled with approval of final designs after the project is approved violated any CEQA mandate. Courts should not interpret CEQA to impose procedural or substantive requirements beyond those explicitly required in the statutes or CEQA Guidelines. (§ 21083.1; *Chaparral Greens* v. *City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1145 [58 Cal.Rptr.2d 152].) CEQA does not mandate the detail appellants urge this court to require. CEQA requires a "general description" of the technical aspects of the stream diversion structures of the project. The description must contain sufficient detail to enable the public and the decisionmakers to understand the environmental impacts of the proposed project. The description cannot narrow the scope of environmental review or minimize the project's impacts on the environment. (*Laurel Heights I, supra,* 47 Cal.3d at p. 405; *San Joaquin Raptor, supra,* 27 Cal.App.4th at p. 730; *City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1450-1455 [263 Cal.Rptr. 340].)

Appellants have not shown that the challenged descriptions do not meet these standards. None of appellants' contentions demonstrate that the description of the water diversion elements was insufficient to understand the environmental impacts of the proposed project. Nor do they demonstrate that the descriptions narrowed the scope of environmental review or minimized environmental impacts. In addition, appellants do not explain how more detailed engineered drawings would allow the public and decisionmakers to "fully understand the environmental consequences of the entire project." In fact, engineered drawings may well supply "extensive detail beyond that needed for evaluation and review of the environmental impact" in violation of Guidelines section 15124. Accordingly, appellants have not demonstrated the water diversion structures are inadequately described in the EIR.

The parties dispute whether the water diversion structures are essential elements of the project or mitigation measures incorporated into the project whose environmental effects can be discussed in less detail than the proposed project. (Guidelines, § 15126, subd. (c).) Regardless of whether the water structures are elements of the project or mitigation measures, they are adequately described under CEQA.

(b) *Dry Creek Drive Improvement Program**

. . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 20.

2.-5.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Judgment affirmed. Costs to respondents.

Stone (W. A.), Acting P. J., and Dibiaso, J., concurred.

*See footnote, *ante*, page 20.