Filed 11/27/24  Sierra Club v. City of Glendale CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SIERRA CLUB,<br><br>   Plaintiff and Appellant,<br><br>   v.<br><br>CITY OF GLENDALE et al.,<br><br>   Defendants and Respondents. | B333632<br><br>(Los Angeles County<br>Super. Ct. No.<br>22STCP00983) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis A. Kin, Judge.  Affirmed.

Earthjustice, Byron Chan, Adam Frankel and Angela Johnson Meszaros for Plaintiff and Appellant.

Cox, Castle & Nicholson, Michael H. Zischke, Lisa M. Patricio, Morgan L. Gallagher and Edward G. Schloss for Defendants and Respondents.

_____

# INTRODUCTION

In February 2022, the Glendale City Council certified an Environmental Impact Report (EIR) and approved a project (the Repowering Project or the Project) to remove outdated power generators from the Grayson Power Plant (Grayson), run by Glendale Water and Power (GWP), and replace them with modern, state-of-art equipment. Plaintiff and appellant Sierra Club (Sierra) filed a petition for writ of mandate, arguing that defendants and respondents the City of Glendale (the City), the City Council, and GWP violated the California Environmental Quality Act (CEQA)[1] by approving the Project based upon an inadequate EIR. Sierra appeals the trial court's decision to deny its writ petition.

Sierra contends the EIR's project description and objectives rested on the inaccurate understanding that GWP was legally obligated to have sufficient reserve capacity to meet demand if it lost both its largest and then second largest sources of electricity. The decision to cover loss of the second largest source, according to Sierra, is not based on any genuine legal requirement, and therefore the EIR misled the City Council into approving an unnecessarily large project. Sierra also contends the EIR's analysis of the Project's impact on environmental justice communities was inadequate because the analysis failed to consider any such impacts outside the city limits.

The City responds that the EIR met the requirements under CEQA for a project description, there was substantial

---

[1] CEQA is codified at Public Resources Code section 21000 et seq. All further undesignated statutory references are to the Public Resources Code.

evidence to support GWP's obligation to have the identified reserve capacity, and CEQA does not require the EIR to include any analysis of a project's impact on environmental justice communities.

We conclude that the EIR's project description met CEQA's requirements, because it accurately described the scope and physical characteristics of the Project such that Sierra has not shown the anticipated environmental impacts of the Project were either minimized or understated, or that the analysis of alternatives was inadequate. Because the EIR transparently addressed the dispute over reserve capacity requirements, interested parties presented their views on the legal issues involved, and the City Council was aware of the conflicting viewpoints, we find no CEQA violation. We further conclude that CEQA does not require an analysis of a project's impacts on environmental justice communities, and therefore the inclusion of a limited discussion of such issues in the EIR, even if less robust than Sierra believes was merited, is not a basis to grant writ relief.

## FACTUAL AND PROCEDURAL BACKGROUND

A. **Initiation of the Project and Initial Environmental Review**

GWP is a municipal utility that serves the electricity needs of residential and commercial customers in Glendale through generating and importing electricity. Since the 1940's, the City has generated some of its own power at the Grayson plant. To address aging equipment at Grayson, in June 2015 the Glendale

3

City Council adopted a resolution directing staff to "proceed with the design, engineering, environmental review, and evaluation of financing options for the proposed 250 [megawatt (MW)] option for repowering the Grayson Power Plant."

An Initial Study was completed in December 2016. A Draft EIR was prepared and circulated in September 2017, and revised in a final version in early 2018. The Project described in the EIR is one to "repower" the Grayson power plant by replacing approximately 238 megawatts (MW) of on-site electrical generation capacity (consisting of 7 fossil fuel powered generating units) with approximately 270 MW of on-site generation capacity (consisting of 4 fossil fuel powered generating units), while rebuilding Grayson and continuing to operate an existing 48 MW generating unit.[2]

In April 2018, the City Council deferred a vote to certify the 2018 Final EIR, instead directing GWP to explore more green and renewable energy alternatives. At the City Council's direction, city staff issued a request for proposals (RFP), and based on responses to that RFP, two clean energy alternatives were selected for further analysis.

---

[2] The 2018 Final EIR explains, "Electrical power is generally measured in watts (W) while energy use is measured in watt-hours (WH). For example, if a light bulb has a capacity rating of 100 W, the energy required to keep the bulb on for one hour (1 H) would be 100 WH. If ten 100 W bulbs were on for one hour, the energy required would be 1,000 WH or one kilowatt-hour (kWH). On a utility scale, a generator's capacity is typically rated in megawatts (MW), which is one million watts, while energy usage is measured in megawatt-hours (MWH), which is one million watt-hours, or gigawatt-hours (GWH), which is one billion watt-hours."

**B.**     **The Partially Recirculated Draft EIR**

In August 2021, the City circulated a Partially Recirculated Draft EIR (PR-DEIR) that evaluated the two new project alternatives, identified as Alternative 7 (the Tesla/Wartsila Repowering Project Alternative) and Alternative 8 (the Tesla/Unit Refurbishment Project Alternative).  The project description and statement of project objectives, however, remained unchanged.  The City received numerous comments from various sources, including state, regional, and local agencies, interest groups, and individuals.  The comments were presented in writing or orally during a meeting on September 9, 2021.

**C.**     **The Project Description and Project Objectives**

**1.** *Project Description*

The EIR includes a two-and-a-half page project description, but the first paragraph provides the key information about the Project as initially proposed:  "The Repowering Project is a power plant repowering project that removes 238 megawatts (MW) gross (219 MW net) of existing old, inefficient, inflexible, and unreliable generation equipment that is past the end of its useful life, and replaces it with approximately 270 MW gross (262 MW net), state-of-the-art, efficient equipment that better fits the requirements and needs of the City.  The Project is located within

5

an industrial area of the City of Glendale . . . just northeast of the Interstate 5 and Highway 134 interchange . . . ."[3]

Describing the purpose of and need for the Project, the EIR states, "The need for the Repowering Project is based on several factors, including providing reliable generating capacity, avoiding electric capacity shortages as identified in GWP's governing Integrated Resource Plan, and facilitating the use of more renewable energy by freeing up transmission line capacity to bring more renewable-based electricity to Glendale.  Additionally, the generating capacity needs to have the flexibility to operate efficiently over the wide range of loads."[4]

"The City serves its power system through a combination of renewable energy imports, nonrenewable imports, and local generation.  To meet retail power demand, GWP relies on a combination of both local and remote generation, as well as long-

_____

[3] The 2022 Final EIR did not revise the entirety of the 2018 EIR, but rather focused principally on section 4 (Environmental Impact Analysis) and section 5 (Alternatives).  Therefore, our discussion of the project description and project objectives cites to the language of the 2018 Final EIR, where relevant.  Future references to "the EIR" generically will either refer to the 2018 Final EIR or the relevant portions of the 2022 Final EIR.

[4] An Integrated Resource Plan (IRP) "is an 'electricity system planning document that describes how utilities plan to meet their energy and capacity resource needs, policy goals, physical and operational constraints, and other utility priorities (such as reducing rate impacts on customer bills).'  Senate Bill 350 requires publicly-owned utilities of a specified size 'to adopt an integrated resource plan and a process for updated the plan at least once every 5 years to ensure the utility achieves specified requirements.' "  [Fns. omitted.]

6

term power purchase agreements and spot market purchases . . . . [¶] Natural gas for generation is supplied by several sources, . . . . [¶] [and as] a result of recent state mandates, GWP is becoming more involved in short- and long-term markets for renewable energy and carbon allowances. These markets however, are not as reliable as self-generation and require backup generation to shape and firm the renewable energy resources." Put more plainly, the purpose of the Project is multifaceted, and on-site generation serves multiple needs, including ensuring a reliable supply of electricity.

## 2. *Project Objectives*

The EIR identified nine project objectives, of which the following six are the most relevant to our current discussion, with Objective number 3 being at the heart of the current dispute:

"1.    Integrate with local and remote distributed renewable energy resources to provide sufficient capacity and energy to ensure reliable service at all times for the City and to support the City's compliance with California's Renewable Portfolio Standards.

"2.    Utilize current and reliable technology and control systems to provide reliable, cost effective, and flexible generation capacity for the City to serve its customer load.

"3.    Provide a local generation resource sufficient to meet resource adequacy requirements, and the City's obligations within the Balancing Area (BA) to balance load and resource at the interconnection with the BA, in accordance with industry standards including North

7

American Electric Reliability Corporation (NERC) and Western Electricity Coordinating Council (WECC) requirements; thus, providing local reliability and contributing to grid stability within the Los Angeles Basin.

"4.    Provide sufficient locally controlled generation to minimize the City's reliance on importing power from remote generation locations through a congested transmission grid system subject to planned and unplanned outages and de-rates, making the delivery of energy to serve load less reliable than local generation.

"5.    Replace the aged, unreliable, less efficient, high maintenance steam boilers with new, efficient, and less environmentally impactful generation technologies that meet South Coast Air Quality Management District (SCAQMD) Rule 1304(a)(2).

"6.    Locate the proposed Project at existing City property already permitted and used for generation to minimize the need for major infrastructure improvements such as fuel supply, water, wastewater, recycled water and transmission facilities, or the need to purchase additional property."  [Fn. omitted.]

In the section analyzing project alternatives, the EIR acknowledged the legal requirement for a statement of project objectives, and the relationship between project objectives and alternative analysis.  Before repeating the project objectives, the EIR stated:  "Within the context of the City's overarching need to ensure a reliable year round supply of power to its residents and

8

customers under various planning contingencies[5], the primary objective of the Project is to replace the aged, less efficient, less flexible, and unreliable generation units at the Grayson Power Plant with approximately 262 megawatts (MW) net of modern power generation that is efficient, reliable, operationally flexible, and can easily integrate into the City of Glendale's existing power system. This Project would ensure system reliability, facilitate and balance renewable imports, and supply the balance of the City's power needs when transmission imports are insufficient, curtailed, or not available to serve its electrical load.[6] In addition, the Project will be able to integrate and accept increasingly available renewable energy resources."

---

[5] "Required planning contingencies include a generating unit suddenly going off line and no longer generating power, the loss of a transmission system (100 MW), or the loss of the source of power being imported over a transmission system. These types of planning contingencies have in fact occurred. Also, while not a required planning contingency, during the Sylmar earthquake the City lost its outside electricity supplies and was islanded (not connected to an off-site power supply through the transmission grid) with only internal generation available."

[6] "The City's ability to import power is limited by the capacity of two existing transmission systems, which combined are less than the full load demands of the City. The transmission lines are subject to curtailments (partial or full reductions in capacity). For example, the capacity of the Pacific DC Intertie (100 MW) was reduced for six months in 2004 and then was completely out of service for an additional three months."

**D.     Sierra's Comments About Reserve Requirements**

Sierra argued in its April 10, 2018 comment letter that the project description was based on a fundamental error, which it explained as follows: "Central to the determination of the size of the project is the claim that the design of the Grayson Project is meant to 'sufficiently meet [Glendale's] peak load and reserve obligations.' "  Sierra argued the claim was based on an "erroneous understanding of Glendale's reserve obligations[,]" and GWP incorrectly claimed NERC reliability standards " 'require[d] it to carry reserves equal to the loss of its single largest contingency (N-1 contingency), and its next largest contingency (N-1-1 contingency).' "  This led GWP to plan for resources to generate 171 MW of power, an amount that was significantly overstated.  Sierra further argued that the only source of a reserve obligation for GWP was the Balancing Authority Area Services Agreement (BAASA), which only "required [GWP] to purchase reserves of 80 MW from LADWP at a specified tariff rate" or to self-supply a portion of that amount.[7]

**E.     The 2022 Final EIR and Responses to Comments about Reserve Requirements**

The 2022 Final EIR did not repeat the project description, but it did repeat the project objectives as part of its discussion of project alternatives.  It also included a section responding to

---

[7] Sierra also criticized the EIR for its decision to limit its analysis of harmful effects on environmental justice communities outside the geographical boundaries of Glendale.

comments received during the public review period for the PR-DEIR.

As pertinent here, section 7.2.1 was a topical response to comments about the project's purpose and objectives. The comment summary stated: "Comments were received questioning the need to repower the Grayson Power Plant. Commenters asked why GWP has not increased import capacity as an alternative to repowering the Grayson Power Plant. Several comments also asserted that GWP has misstated or inflated its energy reserve obligation and is using third-party sales to justify the inclusion of fossil-fired generation in its reserve portfolio."[8] The high-level summary of the topical response stated: "GWP has an obligation to ensure reliable electric service that meets anticipated energy demands referred to as its 'load,' as well as cope with contingency events, such as a transmission line outage or failure of a power generation facility, which disrupt supplies of energy. Glendale's current peak load is 346 MW and is forecasted to increase to 398 MW by 2027." [9]

---

[8] Sierra previously submitted comments in a November 20, 2017 letter, arguing that the EIR's project description and the project objectives were inaccurate, because the project appeared oversized for Glendale's energy needs and appeared to be designed to permit GWP to sell power on the energy market.

[9] The EIR included detailed responses broken into thirteen different topic areas several of which outline the reasons justifying the Project's need to meet reserve requirements in an N-1-1 contingency. The thirteen more detailed responses break down into the following topics:

(1)     Overview of GWP's Obligation to Ensure Reliability

In more detailed responses, the 2022 Final EIR reiterated a statement made in section 2.4 of the 2018 Final EIR: "GWP has not sized the proposed Project to sell energy to other parties." The response explained that the new alternatives "are sized to cover the City's peak demands plus contingencies to ensure a reliable supply to GWP customers." Southern California Air Quality Management District (SCAQMD) permit limitations prevented operating Grayson as a merchant power plant.

In response to the comments that the EIR had misstated or inflated GWP's reserve obligations, the 2022 Final EIR's response

_____

(2)     Reserves and Other Ancillary Service Requirements
(3)     NERC Reliability Standards that Address Reserve Obligations
(4)     NERC Reliability Standards Applicable to Glendale and LADWP
(5)     Glendale's Reserve Obligations Under its Agreements with LADWP
(6)     Glendale's Current N-1 and N-1-1 Reserve Obligations
(7)     Glendale Meets its N-1 and N-1-1 Reserve Obligations Using the BAASA and Internal and External Generation
(8)     Glendale's Balancing Authority Area Services Agreement with LADWP
(9)     Why Hasn't GWP Added More Transmission Import Capacity Instead of Proposing to Repower Grayson
(10)   Existing Grayson Capacity and Proposed Repowering Capacity
(11)   Regulatory Constraints: Units 1-9 Must Comply with Newly Amended SCAQMD Rules by December 31, 2023
(12)   Glendale's Resource Needs
(13)   Third Party Sales of Energy

explained that "to maintain reliable service, GWP must cover both its load and its energy reserve obligations, namely the two largest contingencies." The contingencies refer to the loss of electricity from GWP's supply chain, with the loss the largest source of power being referred to as "N-1," and the loss of the second largest source of power being referred to as "N-1-1." In GWP's case, it would need to plan for the loss of power transmitted through the Pacific Direct Current Intertie (the loss of its largest, single source of power for GWP) and the loss its own largest power generating unit.

In addition to justifying the reserve amount based on the need to maintain reliable service, the response stated, "Glendale is contractually obligated to cover its system's reserve requirements, including the N-1 and N-1-1 contingencies. These obligations stem from longstanding contracts with LADWP that make Glendale solely responsible for covering [its] system's reserve requirements and obligate Glendale to design, construct, operate, and maintain its system in conformance with Good Utility Practice and the applicable North American Electric Reliability Corporation's (NERC) Reliability Standards." The response points to different industry reliability standards and agreements between GWP and LADWP, which GWP interprets to require it to maintain reserves to cover N-1 and N-1-1. The response also referred to extensive correspondence between GWP and LADWP, and the history of GWP's interpretation of its agreements, to support the claim that it is contractually required to cover the two contingencies. "Glendale must size Grayson to enable it to sufficiently meet its peak load and reserve obligations. If Glendale fails to do this, it would be exposed to future reliability risks, which could include extended blackouts

13

on its system, and to the risk of future legal liability arising from its failure to meet its reserve obligations."

## F.     **Public Hearing and Project Approval**

The City Council held a noticed public hearing on February 15, 2022.  At the hearing, an attorney representing Sierra (and another organization) argued to the City Council that GWP had prepared the EIR to include a false claim that Glendale was legally obligated to repower Grayson with sufficient reserves to cover an N-1-1 contingency.  The attorney argued that the City was *not* subject to an N-1-1 reserve obligation, and even if it was, there were other options to meet that obligation, including working with the Los Angeles Department of Water and Power (LADWP).  GWP's outside counsel on utility matters also spoke at the hearing, advocating for the opposite position.  He argued that based on a contract between GWP and LADWP which he was involved in drafting, LADWP had not only taken the position that the City was responsible for covering N-1 and N-1-1 contingencies, but had written a letter requesting a written assurance that GWP would meet its reserve requirements, including the N-1-1 contingency.  During the hearing, council members had questions and voiced comments about GWP's reserve obligations and its communications with LADWP.  The councilmembers' comments reflected their understanding that the question of the extent of GWP's reserve obligations was a hotly disputed issue, and one that implicated GWP's ongoing relationship with LADWP.  Councilmember Agajanian commented "this N-1-1 always bothered me," and said he was not able to accept it until he learned that LADWP had asked GWP

14

for assurances. Councilmember Brotman praised city staff before noting that the council needed to weigh a more complex set of factors, and did not have to find that GWP was incorrect to believe that there was a better approach to the problem. Councilmember Najarian commented on how the differing parties' positions on the issue boiled down to how much risk they were willing to accept.

The City Council voted to certify the 2022 Final EIR. The City Council adopted a resolution to move forward with project alternative number seven, described in the 2022 Final EIR as five "internal combustion engine units producing approximately 93 MW net" and a "battery energy storage system producing approximately 75 MW with a storage capacity of 300 MWH net" both at average annual site conditions. The resolution also adopted a mitigation monitoring and reporting program and a statement of overriding considerations for significant and unavoidable impacts.

## G.    Sierra's Petition for Writ of Mandate

Sierra filed a petition for writ of mandate in March 2022.[10] The petition alleged that "The 2022 Final EIR presents an inaccurate and incomplete Project Description that inflates Glendale's reserve obligation to justify the installation of new

---

[10] In April 2022, the case was related to a separate petition filed by a different petitioner, challenging the same project approval, but on different grounds. The trial court denied that petition, and we affirmed. (*Glendale Residents Against Environmental Destruction v. City of Glendale* (Sept. 30, 2024, B331601 [nonpub. opn.].)

fossil fuel burning units at the Grayson Power Plant.  [¶] The Project Description fails to disclose to decisionmakers that GWP's proposal to install fossil fuel burning units includes potential plans to produce and sell excess fossil-fired energy to neighboring regions."  Sierra sought an order directing the City to withdraw its certification of the EIR and its project approval.  The trial court denied Sierra's petition for writ of mandate on July 31, 2023, and judgment was entered on August 28, 2023.  Sierra filed a timely notice of appeal.

## DISCUSSION

Sierra raises two contentions on appeal, arguing that the EIR violated CEQA because (1) the project description was inaccurate, and (2) the portion of the EIR discussing the Project's impact on environmental justice communities improperly limited the analysis to the geographic boundaries of the City of Glendale.[11]

---

[11] We deny the City's motion to augment the administrative record  and its motion for judicial notice, both of which were opposed by Sierra.  (*Yerba Buena Neighborhood Consortium, LLC v Regents of University of California* (2023) 95 Cal.App.5th 779, 790, fn. 4.)  We also grant in part Sierra's motion to strike those portions of the Respondent's brief that refer to or rely upon a document that was not part of the administrative record.

16

## A.  CEQA Principles and Standard of Review[12]

The EIR is the " 'heart of CEQA.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights*).)  A plaintiff challenging an agency's certification of an EIR bears the burden of overcoming the presumption that the EIR is adequate.  (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 329 (*South of Market*), quoting *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 275; see also *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 [evaluating the legal adequacy of an EIR, "a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise"].)

The California Supreme Court decisions applying the abuse of discretion standard of review in CEQA challenges have "articulated a procedural issues/factual issues dichotomy." (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512.)  "[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence.  (§ 21168.5.)

---

[12] "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case . . . is the same as the trial court's:  [t]he appellate court reviews the agency's action, not the trial court's decision . . . ." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*); see also *Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.)

Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564), we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task is 'not to weigh conflicting evidence and determine who has the better argument.' (*Laurel Heights*, *supra*, 47 Cal.3d at p. 393.)" (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

"An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights, supra*, 47 Cal.3d at p. 405.) "When assessing the legal sufficiency of an EIR, the reviewing court focuses on adequacy, completeness and a good faith effort at full disclosure." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390 (*Irritated Residents*).) Although CEQA "requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 26.) Therefore, noncompliance with CEQA's information disclosure requirements is not necessarily reversible; *prejudice* must be shown. (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1197–1198 (*Bakersfield Citizens*); § 21005, subd. (b).) " '[A] prejudicial abuse of discretion occurs if the failure to include

relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the goals of the EIR process.' [Citations]" (*Irritated Residents, supra,* 107 Cal.App.4th at p. 1391.)  In such event, the error is deemed prejudicial "regardless whether a different outcome would have resulted if the public agency had complied with the disclosure requirements." (*Bakersfield Citizens, supra,* 124 Cal.App.4th at p. 1198.)

"Whether the EIR contains an accurate and stable project description is a question of law subject to de novo review." (*Save Our Capitol! v. Department of General Service*s (2023) 87 Cal.App.5th 655, 673 (*Save Our Capitol*); see also *Stopthemillenniumhollywood.com v. City of Los Angeles* (2019) 39 Cal.App.5th 1, 15.)  "[A]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 199 (*County of Inyo*).)  "An accurate and complete project description is necessary for an intelligent evaluation of a project's potential environmental impacts." (*Save Our Capitol*, *supra*, 87 Cal.App.5th at p. 673.)

A project description "must contain sufficient information to understand the project's environmental impacts." (*Save Our Capitol, supra*, 87 Cal.App.5th at p. 673.)  Under the CEQA Guidelines,[13] "[t]he project description must contain ([a]) the

---

[13] "CEQA is implemented by an extensive series of administrative regulations promulgated by the Secretary of the Natural Resources Agency, ordinarily referred to as the 'CEQA Guidelines.' " (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184.)  The CEQA Guidelines

precise location and boundaries of the proposed project; ([b]) a statement of the objectives sought by the proposed project, including the underlying purpose; ([c]) a general description of the project's technical, economic, and environmental characteristics; and ([d]) a statement briefly describing the intended uses of the EIR. (Guidelines, § 15124.) The description should not, however, 'supply extensive detail beyond that needed for evaluation and review of the environmental impact.' (*Ibid.*)" (*South of Market, supra*, 33 Cal.App.5th at p. 332.)

"Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance." (*County of Inyo, supra*, 71 Cal.App.3d at pp. 192–193.) "A curtailed, enigmatic or unstable project description draws a red herring across the path of public input." (*Id.* at p. 198; see also *South of Market, supra*, 33 Cal.App.5th at p. 332 [a "description that gives conflicting signals to decision makers and the public about the nature of the project is fundamentally inadequate and misleading"].)

## B.    The EIR's Project Description Complied with CEQA

In its briefing, Sierra attempts to knit together a story of palace intrigue to suggest an environmental review process that left the City Council uninformed about the nature of the Repowering Project and its environmental consequences. In doing so, Sierra invites a focus on isolated pieces of information,

---

are codified at title 14 of the California Code of Regulations section 15000 et seq.

20

such as statements in the 2015 IRP, prepared before the City Council directed even an Initial Study under CEQA, statements made by experts and councilmembers during hearings, and portions of public comments and the responses to them. However, considering the legislative intent behind CEQA and the purpose of an EIR as an informational document, and looking at the entirety of the EIR and the process by which the EIR was reviewed and discussed by the public and the City Council, nothing about the disputed issue (whether Glendale was *legally required* to meet N-1-1 contingencies, rather than simply choosing to do so to ensure reliability and grid stability) supports a conclusion that the project description was inadequate under CEQA.

"Informed public participation is essential to environmental review under CEQA." (*Washoe Meadows Community v. Department of Parks & Recreation* (2017) 17 Cal.App.5th 277, 285.) "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts. The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (CEQA Guidelines, § 15151.) The purpose of an EIR is "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the

environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061; see also *Buena Vista Water Storage Dist. v. Kern Water Bank Authority* (2022) 76 Cal.App.5th 576, 587.) " '[O]nly through an accurate view of the project may the public and interested parties and public agencies balance the proposed project's benefits against its environmental cost, consider appropriate mitigation measures, assess the advantages of terminating the proposal and properly weigh other alternatives . . . .' (*City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438, 1454.)" (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 655.) Our focus is on "whether the project description may have thwarted the public's ability to participate in the process and comment meaningfully on the EIR." (*Save Our Capitol, supra*, 87 Cal.App.5th at p. 674.)

Although Sierra attempts to fit its contentions into a claim of an inadequate project description, it points to no way in which the EIR's express project description failed to present decision makers with an accurate, stable, and finite description of the Project that would be undertaken at the Grayson plant. Sierra does not contend that the EIR failed to include all of the information required by CEQA Guidelines section 15124, subdivision (a), relating to the location and boundaries of the Project, or subdivision (c), including the Project's technical, economic, and environmental characteristics.

Instead, the only asserted inaccuracy in the EIR's project description relates to the project objectives, required as part of the project description under the CEQA Guidelines, section 15124, subdivision (b). The Guidelines explain, a "clearly written

22

statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings . . . .  The statement of objectives should include the underlying purpose of the project."  (Guidelines, § 15124, subd. (b); see also *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 272 (*California Oak*).)  Significantly, Sierra does *not* contend that the EIR's list of project objectives undermined the public's or the decisionmakers' ability to understand the adverse environmental consequences of the Project.  Indeed, Sierra's contention that the disputed objective— meeting reserve requirements against an N-1-1 contingency— resulted in decisionmakers approving a Project that was larger than necessary does not undermine the key goal of CEQA: ensuring that decisionmakers are fully informed of a project's potential environmental impacts.  In *South of Market,* the reviewing court found a project description adequate because it "fully disclosed the maximum possible scope of the project[]" and therefore "enhanced, rather than obscured, the information available to the public."  (*South of Market, supra*, 33 Cal.App.5th at p. 334.)  Similarly here, while the project description in the EIR stated that the old equipment, capable of generating 238 MW, would be replaced  with 270 MW of on-site generation capacity, the alternative ultimately approved only involved 93 MW of internal combustion power, supplemented with a 75 MW battery energy storage system with a storage capacity of 300 MWH.  In other words, the project approved in 2022 was significantly smaller than the one described in the original 2018 EIR.

To the extent Sierra contends the EIR's project description misled the City Council because it included among its many objectives Objective Number 3,[14] we are unpersuaded that Sierra's theory makes out a CEQA violation. The EIR's list of project objectives, particularly Objective Number 3, met the goals of CEQA and the CEQA guidelines: it served to advise the public and the City Council of the Project's *multiple* goals, establishing benchmarks to assist interested parties and the approving agency to evaluate the Project and its alternatives. Moreover, the language of Objective Number 3 on its face does not appear to be inconsistent with Sierra's view of matters that could be appropriately considered by the City. Sierra itself concedes that GWP is under an obligation to "meet resource adequacy requirements," to comply with its obligations to balance its load within LADWP's interconnections with Glendale, and to provide local reliability and grid stability. Objective Number 3 does not make any reference to the disputed point—whether resource adequacy should be measured against an N-1-1 contingency—or set forth any specifics on what GWP must do to comply with the industry standards or other obligations.

We also reject Sierra's argument that the EIR was somehow infected with an undisclosed objective to build a power

---

[14] As noted above, Objective Number 3 provided: "Provide a local generation resource sufficient to meet resource adequacy requirements, and the City's obligations within the Balancing Area (BA) to balance load and resource at the interconnection with the BA, in accordance with industry standards including North American Electric Reliability Corporation (NERC) and Western Electricity Coordinating Council (WECC) requirements; thus, providing local reliability and contributing to grid stability within the Los Angeles Basin." [Fn. omitted.]

plant large enough to sell excess electricity.  Sierra points to statements in the 2015 and 2019 IRPs regarding the possibility of revenue generation through sales of excess energy.  The flaw in Sierra's accusation (that GWP formulated a misleading project description in order to gain approval of a larger power plant so it could sell electricity) is that nothing in the project description expressly references the N-1-1 contingency that allegedly justified the project size.  In addition, GWP clearly and expressly repudiated any intent to generate electricity for sale, and the City Council in 2019 had placed limits on the purpose of the new generators.  To the contrary, the permissible time for running the generators would be subject to restrictions based on air quality regulations, a topic that was discussed elsewhere in the EIR.

We also note that while Sierra has raised a challenge to the adequacy of the project description, it has *not* argued that the EIR's analysis of project alternatives is insufficient under CEQA. (Compare *Planning & Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 748 [appellants "make the following four CEQA claims:  (1) the EIR's impact analysis is flawed; (2) the EIR's project definition is inaccurate and unstable; (3) the EIR did not properly consider alternatives; and (4) the department should have recirculated the draft EIR"].)

The conclusion that EIR's project description and the disputed project objective met CEQA's requirements is reinforced by the comment and review process that preceded certification of the EIR.  Sierra's real claim of CEQA error is not that the Project and its objectives were hidden from the public or the City Council, nor could it be:  the written comments and responses to comments, as well as the presentations at the public meeting before the City Council to consider the EIR for certification and

25

the Project for approval are proof that the EIR contained "detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights, supra*, 47 Cal.3d at p. 405.) Through public comments, not only from members of the public, but Sierra itself and GWP, the EIR informed a robust and contentious discussion regarding the extent of GWP's legal obligations to maintain reserves to meet specified contingencies. The record before the City Council included evidence of regulatory requirements, industry practices, contractual agreements, and extensive correspondence between LADWP and GWP regarding the issue of required reserves.

Sierra's contention is, at its core, that the City Council did not adopt Sierra's view of a hotly contested legal question: whether the City is required to maintain a level of reserve capacity to protect against an N-1-1 contingency. Even assuming that the City Council, having heard the opposing views on the disputed legal issue, arrived at an incorrect decision—an issue that we do not reach—we would not find that such a decision shows that "the project description may have thwarted the public's ability to participate in the process and comment meaningfully on the EIR." (*Save Our Capitol, supra*, 87 Cal.App.5th at p. 674.) Both the public and the decisionmakers here were fully aware of the disputed issue, and the City Council's final choice was well within its discretion. " 'CEQA does not restrict an agency's discretion to identify and pursue a particular project designed to meet a particular set of objectives.' " (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 14, quoting *California Oak, supra*, 188 Cal.App.4th at pp. 276–277.)

Finally, we note that in the briefing before the trial court and on appeal, Sierra seeks a ruling on the level of reserves that GWP must maintain to comply with its contracts with LADWP, various agency standards, and Good Utility Practice; or a ruling that GWP is under no legal obligation from any of these sources to maintain reserves to cover N-1-1 contingencies. Sierra invites us to rule that GWP's level of reserves could never, under any circumstance, expose it to liability toward LADWP or other third parties. Sierra attempts to present this as a straightforward legal issue that we should take up on de novo review. The respondents also invite us to wade into the same legal issues, but from the standpoint of finding that the record contains substantial evidence to support that GWP is legally obligated to maintain reserves to cover N-1-1 contingencies, or risk liability to LADWP and other third parties in the event of future outages.

We decline the parties' invitation to analyze and opine on the implications of the various contracts, regulatory schemes, and industry practices as they relate to a hypothetical future circumstance involving outages on GWP's largest, or two largest, sources of power. The record before us is a record compiled to provide information to a legislative body acting as a lead agency under CEQA, not the record of a court proceeding with developed facts and law. The parties to such a future dispute would likely include LADWP, and there is no way to predict what positions LADWP or GWP might take with regard to interpretation or application of contracts, regulatory requirements, utility practices, or the relevance of their historical course of conduct in the context of an actual dispute over legal liability. The same can be said of any other third parties who, as interested parties in connection with future electric outages, might take a position as

to GWP's duties and legal obligations.  There is no sensible way in the current context of reviewing the adequacy of a project description under CEQA that this court could adjudicate or offer an advisory opinion on the scope of GWP's legal obligations under a complex and interconnected scheme that involves confusing definitions of reserves (e.g., spinning, non-spinning, planning, etc.), industry standards that vary based on the role occupied by GWP (e.g., WECC, NERC and "good utility practice"), and obligations imposed either by contract or by long-standing practice (e.g., the balancing agreement with LADWP and other transmission servicing agreements).  The issue of legal risk in these circumstances was appropriately left to the City Council to evaluate and act upon.  Should GWP's reserve capacity fall short in the future, the impacted parties could litigate any dispute over GWP's obligations, considered in a defined and discrete factual context, rather than in the hypothetical context presented by this appeal.

## C. <u>EIR's Discussion of Environmental Justice Communities</u>

Sierra contends that the EIR's discussion of environmental justice communities did not comply with CEQA because it only considered potential impacts to communities within the geographic boundaries of Glendale.  However, Sierra has not established that CEQA requires any discussion of impact on environmental justice communities.  Instead, Sierra argues that the EIR cannot conclude that there is no impact to environmental justice communities by constraining the scope of its inquiry to

28

exclude communities in Los Angeles and Burbank that are physically near the Project but outside the City boundaries.

We find Sierra's argument unconvincing, and rely instead on section 21083.1, which prohibits the courts from interpreting CEQA or the CEQA guidelines "in a manner which imposes procedural or substantive requirements beyond those explicitly stated . . . ." The California Supreme Court has explained that "the purpose of this statute was to 'limit judicial expansion of CEQA requirements[.]' " (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1107.)

## DISPOSITION

The judgment is affirmed. Respondents are awarded costs on appeal.

NOT TO BE PUBLISHED.

MOOR, J.

I CONCUR:

DAVIS, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

29

Sierra Club v. City of Glendale, et al.
B333632


BAKER, Acting P. J., Concurring



Our Supreme Court has observed that "if [the California
Environmental Quality Act (CEQA)] is scrupulously followed, the
public will know the basis on which its responsible officials either
approve or reject environmentally significant action, and the
public, being duly informed, can respond accordingly . . . ."
(*Laurel Heights Improvement Assn. v. Regents of University of
California*, 47 Cal.3d 376, 392.)  As I understand the central
argument made by plaintiff and appellant Sierra Club in this
appeal, the Environmental Impact Report (EIR) certified by the
Glendale City Council defeated CEQA's accountability-ensuring
purpose because it represented the City of Glendale was *legally
obligated* to approve a project meeting N-1-1 power generation
capacity and this statement of legal obligation provided cover for
elected officials to approve the project they did, rather than
approve a project that would have been more environmentally
friendly.

If the EIR did make such an unequivocal representation
about the City of Glendale's legal obligations, I would have
concerns about the majority's analysis and resolution of this
appeal.  As I read the pertinent parts of the EIR as a whole,
however, I do not believe there is such an unequivocal
representation.  Read as a whole, the EIR includes opinions on, or

expressions of concern about, "litigation risks" and "reliability risks" that I do not believe to be improper.

I therefore agree the EIR's project description was adequate, and I further agree CEQA did not require an analysis of impacts on environmental justice communities in this case. (I express no view on whether CEQA might require such an analysis in other circumstances not presented here.)


BAKER, Acting P. J.